*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A16-0088**

Jason Brennan,
Relator,

vs.

Lubrication Technologies, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed July 18, 2016
Affirmed
Schellhas, Judge**

Department of Employment and Economic Development
File No. 33716457-3

Sidney L. Brennan, Jr., Brennan Law Firm, Minnetonka, Minnesota (for relator)

Lubrication Technologies, Inc., Golden Valley, Minnesota (respondent)

Lee B. Nelson, Timothy Schepers, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent Department of Employment and Economic Development)

        Considered and decided by Jesson, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

In this certiorari appeal, relator challenges the decision of an unemployment-law judge that he is ineligible to receive unemployment benefits. We affirm.

**FACTS**

Relator Jason Brennan started working for respondent Lubrication Technologies Inc. (the company) in July 2012 as a full-time chemist. Brennan worked in a relatively small office containing eight cubicles.

In January 2015, the company's general manager spoke with Brennan about his unprofessional behavior after Brennan insulted another employee. The general manager told Brennan not to always speak his mind. In April 2015, another company manager told Brennan during his yearly performance evaluation that he needed to go outside if he had to vent. He also advised Brennan to focus on working hard and maintaining a positive attitude. In May 2015, one of Brennan's coworkers, M.Q., reported to the company's human-resources department (HR) that Brennan was engaging in inappropriate phone conversations, which M.Q. described as loud and discouraging to the other employees in the office. HR advised M.Q. to document any future concerning calls. After another coworker, P.M., reported similar concerns about Brennan's phone conversations, HR gave P.M. the same advice.

M.Q. transcribed and reported what he overheard Brennan say during multiple telephone conversations throughout May 2015. During these calls, Brennan referred to a former manager as a "slippery son of a b-tch" and stated that the company "should actually

think before we shoot from the hip." He also said that he could write a 30-page thesis "[a]bout how much stupidity is here" and that he would tell his managers to "eff off" if they asked him for help.

The reports of those telephone conversations prompted HR to issue a written warning to Brennan on May 28, 2015. The warning listed the previous two discussions with Brennan in January and April 2015 as previous warnings in which the company told Brennan "that unprofessional behavior of this type [wa]s unacceptable and w[ould] not be tolerated." The company informed Brennan that the use of profanity and disparaging remarks "lack[ed] the level of professionalism" that the company expected and "violate[d] the Employee Conduct Expectation outlined in the" company's handbook. And the company warned Brennan that any future similar conduct would result in his discharge from employment with the company.

The day after the company gave Brennan the written warning, M.Q. reported another telephone conversation that occurred the previous day. During that telephone conversation, Brennan referred to one of his prior managers as a "[w]orthless f---ing manager, and a d-ckbag of a tech director." M.Q. also reported that Brennan stated, "Who says I can't manage my medication, I just take too much of it. Keeps me from killing all of you f---s, I think I would just kill everyone." P.M. also reported the telephone call to HR. After Brennan's manager discussed the telephone call with HR, the company discharged Brennan from employment.

Brennan applied for unemployment benefits from respondent Minnesota Department of Employment and Economic Development (DEED), and DEED determined

that Brennan was ineligible to receive benefits because the company discharged him for employment misconduct. Brennan appealed the determination, and an unemployment-law judge (ULJ) conducted a telephone hearing. Brennan testified that he only recalled portions of the reported phone conversations, but he did not deny that any of the conversations took place. The ULJ found that Brennan made the statements and that his statement about killing everybody "was not only threatening but amounted to employment misconduct." The ULJ therefore decided that Brennan was ineligible for unemployment benefits and affirmed that decision following Brennan's request for reconsideration.

This certiorari appeal follows.

**D E C I S I O N**

**I.**

> The Minnesota Court of Appeals may affirm the decision of the unemployment law judge or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion, or decision are:
> (1) in violation of constitutional provisions;
> (2) in excess of the statutory authority or jurisdiction of the department;
> (3) made upon unlawful procedure;
> (4) affected by other error of law;
> (5) unsupported by substantial evidence in view of the entire record as submitted; or
> (6) arbitrary or capricious.

Minn. Stat. § 268.105, subd. 7(d) (Supp. 2015).

If an employee is discharged for employment misconduct, he is disqualified from receiving unemployment benefits. Minn. Stat. § 268.095, subd. 4(1) (2014). "Employment

4

misconduct" includes "any intentional, negligent, or indifferent conduct, on the job or off the job that displays clearly . . . a serious violation of the standards of behavior the employer has the right to reasonably expect of the employee." *Id.*, subd. 6(a)(1) (2014). "Whether an employee engaged in conduct that disqualifies the employee from unemployment benefits is a mixed question of fact and law." *Stagg v. Vintage Place Inc.*, 796 N.W.2d 312, 315 (Minn. 2011) (quotation omitted). We "review the ULJ's factual findings in the light most favorable to the decision" and "will not disturb those findings as long as there is evidence in the record that reasonably sustains them." *Id.* (quotation omitted). "Determining whether a particular act constitutes disqualifying misconduct is a question of law that we review de novo." *Id.*

Brennan argues that he made the May 28, 2015 comment about killing everyone at his workplace in jest and that no evidence suggests otherwise. He asserts that because he made the comment in jest, it was not a threat and therefore did not constitute employment misconduct. DEED argues that the record supports the ULJ's finding that Brennan's comment about killing everyone was threatening and, even if it was not threatening, Brennan's repeated offensive remarks in the workplace, on their own, constituted employment misconduct.

The record evidence reasonably sustains the ULJ's finding that Brennan's statement about killing his coworkers was threatening. Brennan's statement concerned his coworkers, M.Q. and P.M., enough that they separately reported the conversation to HR soon after Brennan made the comment. When Brennan's attorney asked M.Q., "You personally didn't take [the comment] to mean you, did you?" M.Q. responded: "I'm included in everyone.

5

But I didn't think he was, if there were to be killings I would not be the only one based on the sentence I guess you could say. It would be all of them, all of us." Although P.M. testified that he thought Brennan's statement may have been a joke, P.M. testified that Brennan sounded angry during the conversation, and M.Q. testified that he thought Brennan sounded serious. We conclude that M.Q.'s and P.M.'s testimony reasonably sustains a finding that Brennan's statement was threatening.

Brennan argues at length that the statement is not a threat or threatening because it does not meet the definition of a threat as defined in caselaw interpreting Minnesota's terroristic-threats statute. *See* Minn. Stat. § 609.713, subd. 1 (2014). His argument is unavailing. Because the ULJ found that the statement was threatening, the question before this court is whether the record reasonably sustains that finding—not whether the statement was enough to charge Brennan for making a terroristic threat. And the case before us is a civil case, not a criminal case. Brennan's reliance on the criminal statute is therefore misplaced.

Moreover, Brennan's comment about killing his coworkers amounts to employment misconduct even if it is not interpreted as threatening. An employee's conduct can constitute employment misconduct—even if the conduct occurs as a single incident—if the employee "deliberately chooses a course of conduct that is adverse to the employer," *Schmidgall v. Filmtec Corp.*, 644 N.W.2d 801, 806 (Minn. 2002), or, put differently, "is in willful disregard of an employer's interest . . . [in the] standards of behavior which the employer has a right to expect of his employee." *Auger v. Gillette Co.*, 303 N.W.2d 255, 257 (Minn. 1981). As in *Auger*, the company "had a clear and substantial interest in

6

maintaining a responsible, self-disciplined work environment," which means it also had a clear and substantial interest in maintaining a safe work environment that it had a right to expect its employees not to disregard. 303 N.W.2d at 257. Joking about killing people in the workplace constitutes a willful disregard of that interest.

"[A]n employee's decision to violate knowingly a reasonable policy of the employer is misconduct. This is particularly true when there are multiple violations of the same rule involving warnings or progressive discipline." *Schmidgall*, 644 N.W.2d at 806−07 (citation omitted). The analysis above assumes that the company discharged Brennan only because he made the single threatening statement on May 28, 2015. But Brennan was warned in January and in April 2015 about his use of profanity and the need to maintain a positive attitude in the workplace. Throughout May 2015, he disregarded his managers' requests by criticizing the company and its managers, making a threatening statement, and making all of the statements at a volume that his coworkers could overhear. His continued conduct constituted multiple violations of the company's rules that he had been warned not to violate. We therefore conclude that Brennan's conduct constituted employment misconduct.

## II.

Brennan argues that the ULJ erred by denying his request for the ULJ to issue a subpoena for his brother's exit-interview notes. Brennan's brother worked for the company until he resigned in April 2015. He participated in an exit interview that he testified about during the hearing. Brennan testified that he thought he was treated differently after his brother left the company. He requested the subpoena because he believed the notes might

show that he was referred to as a "poison" or "cancer," which could demonstrate that he was discharged as part of a conspiracy concocted by the company to get rid of him. The ULJ refused to issue a subpoena for the exit-interview notes, reasoning that the notes were unnecessary to make a decision in the case.

We review a ULJ's decision regarding the issuance of a subpoena for an abuse of discretion. *Icenhower v. Total Auto., Inc.*, 845 N.W.2d 849, 853 (Minn. App. 2014), *review denied* (Minn. July 15, 2014). A ULJ "must ensure that all relevant facts are clearly and fully developed" during an unemployment-benefits hearing. Minn. R. 3310.2921 (2015). A ULJ "*may* issue subpoenas to compel the attendance of witnesses, the production of documents or other exhibits, upon a showing of necessity by the requesting party." Minn. R. 3310.2914, subp. 1 (2015) (emphasis added). "A request for a subpoena may be denied if the testimony or documents sought would be irrelevant, immaterial, or unduly cumulative or repetitious." *Id.*

Brennan argues on appeal that the notes are relevant and necessary because they show the company's bias against him. DEED argues that the notes are not relevant because Brennan failed to substantiate his claim that he was discharged as part of a conspiracy to retaliate against him and that he failed to make an offer of proof as to what the notes might show. DEED also points out that Brennan's brother testified at the hearing about the exit interview and that Brennan had the opportunity to cross-examine each of the company's representatives about the exit interview.

We agree with DEED. Brennan failed to provide an adequate offer of proof as to how the contents of the notes are relevant, which he admits in his brief when he states that

8

the relevance will "only be known after the exit interview of [Brennan's brother] is produced." Brennan's brother testified during the hearing that he was not sure whether Brennan even came up during the exit interview or whether he told the interviewer that he spoke to Brennan about concerns he had with the company. And Brennan had the opportunity to question multiple company representatives. Because there is no offer of proof beyond pure speculation about the contents of the notes and Brennan had the opportunity to question many witnesses about the topic, we conclude that the ULJ did not abuse its discretion when it decided not to issue a subpoena because the exit-interview notes were unnecessary to make a decision.

Brennan also argues that the refusal to issue the subpoena denied him a fair hearing. Brennan's argument is unpersuasive. During an unemployment-benefits hearing, "[e]ach party may examine witnesses, cross-examine the other party's witnesses, and offer and object to exhibits." *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529 (Minn. App. 2007) (citing Minn. R. 3310.2921 (2005)). The ULJ allowed Brennan to examine witnesses, cross-examine the other party's witnesses, and offer and object to exhibits. The hearing spanned multiple days due to the ULJ's effort to hear from all of the relevant witnesses. The ULJ also allowed both parties to submit written closing arguments and entertained Brennan's subpoena argument in writing during the hearing, orally throughout the hearing, and again in his request for reconsideration.

**Affirmed.**